IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>vs.<br><br>MAGNESIUM CORPORATION OF AMERICA, et al.,<br><br>          Defendants. | **MEMORANDUM OPINION<br>AND ORDER**<br><br>Case No.  2:01 CV 040<br><br>Judge Dee Benson |

## I.  INTRODUCTION

The United States of America, Plaintiff in this action, filed a complaint on January 16,

2001, "to obtain injunctive relief and civil penalties for [Defendants'] numerous violations of the

Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901 *et seq*."

(Complaint at 2.)  Defendant US Magnesium, LLC ("USM") currently owns and operates the

magnesium mining and processing facility located on the western shore of the Great Salt Lake

(the "Rowley Facility") that is the subject of the United State's complaint.[1]  USM filed a motion

---

[1]  USM became a party to this action when the United States filed an amended complaint on October 4, 2002.  At that time, USM had recently purchased the Rowley Facility from another defendant, Magnesium Corporation of America ("MagCorp."), through an asset sale supervised and approved by the Bankruptcy Court in the United States District Court for the Southern District of New York.

for partial summary judgment asking the Court to dismiss substantially all of the United States claims in the RCRA case.[2]  In response, the United States filed a cross motion for partial summary judgment, asking the Court to agree with its interpretation of RCRA's applicability to certain wastewaters generated at the Rowley Facility.  Having considered the parties' arguments and the relevant law, the Court now issues the following memorandum opinion and order.

## II.  BACKGROUND

### A.     <u>Primary Magnesium Processing at the Rowley Facility</u>

USM "is the only producer of primary magnesium in the United States, operating manufacturing facilities on the Great Salt Lake where magnesium has been produced since 1972."  Http://www.usmagnesium.com/.[3]  USM produces magnesium metal though an industrial process that extracts the magnesium from the salty water of the Great Salt Lake (also referred to as brine).  (USM's Mem. in Supp. at 5.)  In order to extract the magnesium from the lake water, USM utilizes an anhydrous (i.e. "with all water removed") purification and electrolytic process at the Rowley Facility that is essentially the same process that has been in place since 1972.  USM sells the magnesium it produces for use in the aviation, automotive, and other industries.

---

[2]  The United States filed a second lawsuit against USM and the other defendants in May 2005, alleging violations of the Toxic Substances Control Act ("TSCA") at the Rowley Facility.  The Court consolidated the TSCA lawsuit with the original RCRA lawsuit in June 2005.  USM's motion does not seek the dismissal of these TSCA claims, nor certain RCRA claims that do not involve the Bevill Amendment.  (Defs.' Mem. in Supp. S.J. at 3.)

[3]  The magnesium production process at the Rowley Facility was originally developed by Nation Lead Co. In 1980, Amax Inc. purchased the Rowley Facility and its subsidiary, Amax Magnesium (collectively referred to as "Amax") operated the facility until 1989.  MagCorp purchased the Rowley Facility in 1989 and operated it until USM purchased the assets of MagCorp in 2002.  Http://www.usmagnesium.com/.

### 1.      Purification Process

The first phase of the magnesium production process is purification.  The objective during the purification process is to remove everything from the Great Salt Lake water but pure magnesium chloride.  The process begins by concentrating the brine through evaporation in a series of solar ponds.  The concentrated brine is stored in large holding ponds where it goes through two chemical processes to remove sulfate and boron.  The brine is then sent to spray dryers where it is sprayed into a hot chamber and becomes a powder.  As a result of the high temperatures in the spray drying process, some of the magnesium chloride molecules are inadvertently converted into magnesium oxide molecules, which must be converted back into magnesium chloride.  Also, the small of amount of water remaining after spray drying must be completely removed to avoid the creation of more magnesium oxide.

Conversion of magnesium oxide to magnesium chloride and removal of water are accomplished in a melt/reactor, which melts the spray dried powder while injecting pure chlorine gas to facilitate the desired chemical reaction.  The molten material produced in the melt/reaction process is pure magnesium chloride.  Additionally, exhaust gasses originate during the melt/reaction process that contain various forms of chlorine and particulate matter.  The exhaust gasses are treated through a series of devices, consisting of melt/reactor Ducon scrubbers, a chlorine reduction burner and scrubber, packed tower scrubbers, and a high energy scrubber.  In the process of dealing with the melt/reactor exhaust gasses, USM converts chlorine gas into hydrochloric acid, some of which is reused in magnesium processing, and some of which is sold.

The melt/reactor Ducon scrubbers are the first devices to clean the melt/reactor exhaust gasses with a liquid in the form of recirculated hydrochloric acid scrubber solution.  This

scrubber solution is sprayed through the exhaust gasses to remove hydrogen chloride gas.  When hydrogen chloride gas comes in contact with the scrubber solution, the gas is captured in the sprayed liquid and becomes hydrochloric acid and part of the scrubber solution.  The Ducon scrubbers also remove some of the particulate matter from the melt/reactor exhaust gasses.

The chlorine reduction burner and scrubber, installed at the Rowley Facility in 1990, cleans the chlorine gas portion of the melt/reactor exhaust gasses by converting the chlorine gas into hydrogen chloride gas and then scrubbing it.  Conversion is accomplished by burning the chlorine molecules in a natural gas flame to form hydrogen chloride gas.  The scrubber part of the devise sprays recirculated hydrochloric acid scrubber solution through the hydrogen chloride gas to cool and capture it in the sprayed liquid, which then becomes hydrochloric acid and part of the scrubber solution.  The chlorine reduction burner and scrubber also removes some of the residual particulate matter from the melt/reactor exhaust gasses.

Next, a series of three packed tower scrubbers use water and recirculated hydrochloric acid scrubber solution to further remove residual hydrogen chloride gas and some particulate matter from the melt/reactor exhaust gasses.  Most of the scrubber solution from the packed tower scrubbers, the chlorine reduction burner and scrubber, and the Ducon scrubbers, is recirculated back through these scrubbers.  A small percentage is discharged to the wastewater pond and some is recovered for reuse.  Any upsets or overflows of scrubber solution from these scrubbers are discharged to the wastewater pond through what are known as seal legs.  Seal legs are devices that protect equipment and ducting from pressure surges.

Finally, the high energy scrubber removes residual particulate matter originating in the melt/reaction process by accelerating movement of the gasses through the scrubber while at the

4

same time spraying water through the gas.  The sprayed water captures particulate matter and most of the residual hydrogen chloride gas.  The scrubber solution used in the high energy scrubber is recirculated in this scrubber alone and then all of the scrubber solution is discharged to the wastewater pond.

### 2.  Electrolytic Process

The second phase of the magnesium production process begins with the purified molten magnesium chloride produced in the melt/reaction process.  Special molten material haulers transfer the molten magnesium chloride to electrolytic cells where it is separated by electric current into pure magnesium metal and chlorine gas.  The pure magnesium metal is collected and hauled to the casting area where it becomes the final magnesium product, while exhaust gasses originating in the electrolytic cells are treated.  The exhaust gasses contain chlorine and droplets of molten electrolyte salts that eventually cool to become anode dust.  The gasses are collected in a system of ducts and pipes leading to the electrolytic Ducon scubber, and from there to the water wash column.  In the process of treating the exhaust gasses from the electrolytic cells, USM recovers chlorine gas that is later converted to a liquid for reuse or sale.

The electrolytic Ducon scrubber uses water to remove anode dust from the electrolytic cell exhaust gasses.  Also, due to the high temperatures, some hydrogen from the scrubber water also reacts with some chlorine in the gas to form hydrogen chloride gas, which is water soluble and becomes hydrochloric acid and part of the scrubber wastewater.  The wastewater flows into the Ducon sump and is eventually discharged into the wastewater pond.  While most of the anode dust is removed in the Ducon scrubber, some of the anode dust settles in the bottom of the ductwork leading from the electrolytic cells to the Ducon scrubber.  Most of the anode dust is

removed and disposed of off-site, while some escapes and is consolidated in the Ducon sump.[4]

Next, the water wash column uses water to scrub residual anode dust and hydrogen chloride gas from the exhaust gasses.  The water wash column wastewater is discharged into the wastewater pond.  At this point, the cleaned chlorine gas from the electrolytic cells is purified to remove air and water by chilling and compressing it so that it becomes a liquid.  Some of the chlorine is then vaporized back to a gas for reuse in the melt/reaction process while some is sold.

### B.    RCRA and the Bevill Amendment

In 1976, the United States Congress enacted legislation known as the Resource Conservation and Recovery Act of 1976 ("RCRA").  Pub. L. No. 94-580, 90 Stat. 2795 (1976) (codified as amended at 42 U.S.C. §§ 6901 to 6992k (1994 & Supp. V 1999)).  The purposes of RCRA include the promotion and protection "of health and the environment and to conserve valuable material and energy resources by," among other things, regulating the treatment and disposal of hazardous wastes that would otherwise adversely affect the environment.  *Id.* at 2798 (codified at 42 U.S.C. § 6902).  Congress included a section in RCRA entitled "Hazardous Waste Management," also known as RCRA Subtitle C, which regulates solid wastes, including liquids, that qualify as hazardous wastes.  *Id.* at 2806 (codified at 42 U.S.C. §§ 6921 to 6939e).  RCRA also contained a directive to the Environmental Protection Agency ("EPA") to promulgate standards for identifying and listing hazardous wastes that would be subject to the provisions of RCRA's Subtitle C.  *Id.* at 1806 (codified at 42 USC § 6921(b)).

Pursuant to the congressional directive, the EPA published "Proposed Guidelines and

---

[4]  Prior to February, 2002, all of the settled anode dust was manually removed from collection points along the ductwork, known as grizzly boxes, where it was washed into a ditch with water, eventually making its way to the wastewater pond.

6

Regulations and Proposal on Identification and Listing" for RCRA Subtitle C hazardous waste

on December 18, 1978.  43 Fed. Reg. 58946 (Dec. 18, 1978).  The EPA proposed "deferral of

applicability of most of the treatment, storage, and disposal standards for selected high-volume,

relatively low risk waste categories until information is gathered and assessed to determine how

they can best be handled."  *Id*. at 58948.  As a basis for this "special waste" designation, the EPA

recognized that certain high volume wastes, including many mining wastes, would otherwise be

regulated under RCRA Subtitle C.  The EPA proposed that such "special waste" be subject to

fewer regulatory requirements than other hazardous wastes because "such waste occurs in very

large volumes" and "the potential hazards posed by the waste are relatively low."  *Id*. at 58991-

92.  The EPA stated that it would address these high volume, low risk wastes in later regulations,

and solicited information and comments that would assist it in developing substantive standards

for the treatment and disposal of these "special wastes."  *Id*. at 58992.  Consistent with this

approach, the EPA included as "special wastes" certain high volume and low risk wastes from

the "extraction, beneficiation, and processing of ores and minerals."  *Id*. at 59016.

On May 19, 1980, the EPA promulgated final regulations that defined hazardous waste

and listed specific hazardous wastes that were to be subject to RCRA Subitle C regulation.  45

Fed. Reg. 33174 (May 19, 1980).  The EPA did not include the "special wastes" concept in these

final regulations because the EPA had revised its criteria for defining hazardous waste.  *Id*.

These final regulations were to take effect on November 19, 1980.  *Id*. at 33084.

On October 21, 1980, just prior to when the proposed EPA regulations were to take

effect, Congress enacted what became known as the "Bevill Amendment" to RCRA Subtitle C.

The "Bevill Amendment" was part of the larger "Solid Waste Disposal Act Amendments of

1980" to RCRA.  Pub. L. No. 96-482, 94 Stat. 2334; 42 U.S.C. § 6921(b)(3)(A)(ii)(1994).

Congress enacted the Bevill Amendment, named after its sponsor, Congressman Thomas Bevill

of Alabama, because it concluded that the EPA's stringent and expensive hazardous waste

management program might be inappropriate and unnecessary for high volume, low hazard

wastes from industries such as utilities, oil and gas, cement, and mining.  *See id*.  Congress

feared regulatory overkill and felt that exempting high volume, low toxicity wastes generated in

the manufacture of mineral products was essential to the nation's strategic and economic

interests.  *See id*.

   The Bevill Amendment suspended RCRA regulation of certain categories of mining

wastes until at least six months after the EPA had: (1) conducted studies pursuant to terms set

forth in the amendment to determine whether RCRA regulation was appropriate for any of those

wastes; (2) submitted a report to Congress on the results of those studies; and (3) issued a

regulatory determination based on the same.  94 Stat. 2336-37, 2349, 2351-52 (codified at 42

U.S.C. §§ 6921(b)(3)(A)(ii), 6921(b)(3)(C), 6982(f) & (p) (1994)).  The categories of waste that

were potentially eligible for the exemption provided by the Bevill Amendment included "solid

waste from the extraction, beneficiation, and processing of ores and minerals."  94 Stat. 2337

(codified at 42 U.S.C. § 6921(b)(3)(A)(ii)(1994)).

   **C.      Promulgation of EPA's Hazardous Waste Regulations**

   In response to the Bevill Amendment, the EPA amended its hazardous waste regulations

in order to exclude all of the statutorily prescribed categories of mining wastes from RCRA

Subtitle C regulation on a temporary basis, including wastes from mineral extraction,

beneficiation, and processing.  45 Fed. Reg. 76619 (Nov. 19, 1980).  Thereafter, the EPA

8

proposed a reinterpretation of the Bevill Amendment's mining waste exclusion as it pertained to processing wastes, *see* 50 Fed. Reg. 40292 (Oct. 2, 1985), but then withdrew the proposed reinterpretation.  *See* 51 Fed. Reg. 26233 (Oct. 9, 1986).  As a result, environmentalists sought review of the EPA's decision to withdraw the reinterpretation because it left six hazardous smelter wastes unregulated under RCRA Subtitle C.  In July, 1988, the United States Court of Appeals for the District of Columbia Circuit ordered the EPA to relist the six hazardous wastes and found that Congress intended that the Bevill Amendment only exempt "high volume, low hazard" waste as "processing" waste from RCRA Subtitle C regulation.  *Environmental Defense Fund v. EPA*, 852 F.2d 1316, 1328-29 (D.C. Cir. 1988), *cert. denied*, 109 S. Ct. 1120 (1989).  In addition to a directive to narrow the exclusion as it applied to mineral processing wastes, the DC Circuit also established a schedule for the EPA's completion of its rulemaking process pursuant to the Bevill Amendment.

In compliance with the decision of the DC Circuit, the EPA published a proposed rule on October 20, 1988, which promulgated standards for defining mineral processing wastes.  53 Fed. Reg. 41288 (Oct. 20, 1988).  This proposed rule also identified 15 mineral processing wastes which the EPA believed met the proposed criteria.  *Id.*

On November 18, 1988, Amax, the then owner of the Rowley Facility, submitted comments regarding the EPA's October 20, 1988, proposed rule.  (USM's Mem. in Supp. S.J. Ex. H.)  In its comments, Amax nominated the "process wastewater from primary magnesium produced by the anhydrous process" at its Rowley Facility for exclusion from RCRA Subtitle C regulation pursuant to the Bevill Amendment.  (*Id.* at 4.)  At that time, Amax provided the EPA with a brief description of the anhydrous process at the Rowley Facility, along with information

regarding the volume and toxicity levels of the wastewater that was produced.  (*Id.*)

In February, 1989, as part of its data gathering efforts to support its Bevill rulemaking, the EPA distributed a "National Survey of Solid Wastes from Mineral Processing Facilities" to mineral processing facilities throughout the United States, including Amax's Rowley Facility. (USM's Mem. in Supp. S.J. Ex. K.)  The survey was "designed to obtain information on the generation and management of selected solid wastes from mineral processing facilities."  (*Id.*) The survey requested details regarding the quantities and characteristics of the mineral processing wastes generated by the survey respondents.  (*Id.*)  Amax provided the EPA with a response to the survey detailing magnesium processing by the anhydrous process at the Rowley Facility.  (*Id.*)  The response included estimates regarding the amounts of wastewater associated with magnesium processing, along with diagrams and written responses showing the origins of various wastewater streams.  (*Id.*)  Amax reported that the amount of "Waste Water from the Anhydrous Process" generated at the Rowley Facility in 1988 as a result of its magnesium chloride "Purification and Electrolysis" process was 2,717,000 short tons.  (*Id.*)

In reviewing the survey responses from the various mineral processing facilities, and prior to completing its final regulatory determination, the EPA corrected inconsistencies where it found them.  (*See* USM's Mem. in Supp. S.J. Ex. J.)  "In some instances, survey respondents incorrectly identified or improperly aggregated their 'special wastes;' in these cases, EPA reviewed the survey questionnaires carefully, and made appropriate adjustments to the reported waste generation rates."  (*Id*. at 2.)  The EPA did not alter Amax's survey responses with regard to identification or aggregation of waste from magnesium processing by the anhydrous method, but merely adjusted the unit of measurement used for volume figures.  (USM's Mem. in Supp.

S.J. Ex. M (Amax's response to survey reporting 2,717,000 short tons) compared to USM's

Mem. in Supp. S.J. Ex. K (Amax's response to survey with EPA notations showing

approximately 2,465,000 metric tons).)

In addition to the 1989 survey, the EPA also sent a separate, more specific request for

information to Amax in order to confirm whether the Bevill Amendment nominated wastewater

at the Rowley Facility met the criteria the EPA had developed to determine whether a waste was

low hazard.  This request, dated March 15, 1989, requested "all existing data collected since

January 1, 1984 on the physical . . . and chemical composition . . . of any of the following wastes

generated at your magnesium . . . production [facility]: Magnesium Waste – Wastewater from

Anhydrous process.  (USM's Mem. in Supp. S.J. Ex. N (emphasis in original).)  Amax

responded to this request on March 30, 1989, providing the EPA with a "compilation of the

available chemical composition information concerning 'Wastewater from the Anhydrous

Process.'"  (USM's Mem. in Supp. S.J. Ex. O.)

On April 17, 1989, the EPA promulgated another proposed rule that substantially revised

and superseded its October, 1988 proposal.  54 Fed. Reg. 15316 (Apr. 17, 1989).  In addition to

updating and changing the method by which the EPA would study mineral processing wastes,

the new rule proposed regulatory determinations regarding certain nominated Bevill Amendment

wastes.  *Id*.  Specifically, the EPA proposed that six mineral processing wastes be retained within

a temporary exclusion from RCRA Subtitle C regulation.  *Id*.  An additional thirty three other

mineral processing wastes would be conditionally retained pending the collection of additional

data regarding their hazardous nature.  *Id*.  All other mineral processing wastes would cease to be

excluded.  *Id*.  "Process wastewater from primary magnesium processing by the anhydrous

process" was one of the thirty three conditionally retained wastes.  *Id.*

As part of the information gathering process, EPA employees, along with representatives of EPA contractors, visited the Rowley Facility on June 20, 1989, to sample wastewater for laboratory analysis.  (USM's Mem. in Supp. S.J. Ex. P.)  The EPA and its contractors were responsible for determining the sample locations and "[s]amples were collected 'as generated' for the Bevill Amendment ruling and 'as disposed' for a report to Congress concerning the treatability of mining wastes."  (*Id.* at 1.)  The EPA collected and tested two samples obtained at the Rowley Facility in June 1989.  (USM's Mem. in Supp. S.J. Ex. P & Ex. R.)  The EPA collected one sample from the main wastewater canal at a point before it empties into the waste pond, and the other from the waste pond itself.  (USM's Mem. in Supp. S.J. Ex. P at 8.)  The EPA's analysis of the samples established that the wastewater collected at the Rowley Facility passed both pH and toxicity/mobility tests.  (USM's Mem. in Supp. S.J. Ex. R & Ex. T.)  Thus, the EPA determined that "process wastewater from primary magnesium processing by the anhydrous method" qualified as a "low hazard" waste.  (USM's Mem. in Supp. S.J. Ex. T.)

On September 1, 1989, in a final agency rule responding to the DC Circuit's directive to narrow the Bevill Amendment's exclusion as it applied to mineral processing wastes, the EPA established the final criteria by which a mineral processing waste would be evaluated for exclusion from RCRA Subtitle C hazardous waste regulation.  54 Fed. Reg. 36592 (Sept. 1, 1989).  The EPA also finalized the Bevill status of nine mineral processing wastes and modified the list of wastes to be conditionally retained.  *Id.*  The updated list of twenty conditionally retained wastes included "[p]rocess wastewater from primary magnesium processing by the anhydrous process."  *Id.*  According to this final rule, in addition to high volume and low toxicity

requirements, in order for a waste to be eligible for exclusion, it must meet the definition of a

mineral processing waste as defined by the following elements:

> (1) Excluded Bevill wastes must be solid wastes as defined by EPA;
> (2) Excluded solid wastes must be uniquely associated with mineral industry operations;
> (3) Excluded solid wastes must originate from mineral processing operations that possess all of the following attributes:
>> a.  Follow beneficiation of an ore or mineral (if applicable);
>> b.  Serve to remove the desired product from an ore or mineral, or from a beneficiated ore or mineral, or enhance the characteristics of ores or minerals, or beneficiated ores or minerals;
>> c.  Use mineral-value feedstocks that are comprised of less than 50 percent scrap materials;
>> d.  Produce either a final mineral product or an intermediate to the final product; and
>> e.  Do not combine the product with another material that is not an ore or mineral, or beneficiated ore or mineral (e.g. alloying), do not involve fabrication or other manufacturing activities, and do not involve further processing or a marketable product of mineral processing.
> (4) Residuals from treatment of excluded mineral processing wastes must be historically or presently generated and must meet the high volume and low hazard criteria in order to retain excluded status.

*Id*. at 36614.

On January 23, 1990, in another final rule, the EPA identified twenty wastes for potential

exemption from RCRA Subtitle C hazardous waste regulation pursuant to the Bevill

Amendment.  55 Fed. Reg. 2322 (January 23, 1990).  The EPA's list of special wastes were each

high volume, low hazard, and met the definition of a mineral processing waste.  *See id*.  Once

again, "[p]rocess wastewater from primary magnesium processing by the anhydrous process"

was on the list.  *Id*.  This final rule completed EPA rulemaking regarding the regulatory status of

these twenty special wastes.  *Id*.  However, the EPA's retention of these special wastes was still

conditional pending the completion of the statutorily mandated Report to Congress and the

EPA's own final regulatory determination.  *Id*.

In reaching its list of twenty mineral processing wastes, the EPA considered public comments on previous proposals, along with an analysis of the data gathered by the EPA pertaining to each waste.  *Id*.  As a result of its analysis, the EPA clarified the waste stream definitions of several of the twenty excluded mineral processing wastes from previous EPA proposed rules.  *Id*. at 2338.  The January, 1990 final rule did not revise the scope of the exemption for the mineral processing waste at the Rowley Facility as originally proposed by Amax in its November, 1988 proposal.  *See id*.

On July 31, 1990, the EPA published the statutorily mandated "Report to Congress On Special Wastes From Mineral Processing."  (USM's Mem. in Supp. S.J. Ex. C.)  The 1990 Report to Congress applied eight statutorily mandated study factors to evaluate whether RCRA Subtitle C regulation was appropriate for each of the twenty final mineral processing wastes.  (*Id*.)  Because the Rowley Facility was the only facility in the United States producing magnesium by the anhydrous process, Chapter 11 of the Report to Congress specifically addressed the exemption as applied to that facility.  Chapter 11 contains a brief written description and diagram of the magnesium production process using the anhydrous process at the Rowley Facility.

The Report to Congress identified two sources of exempt process wastewaters, "scrubber underflow" from "chlorination," and "scrubber liquor" from "electrolysis."  (*Id*.)  Chlorination and the wastewater that is produced as a result were described as follows:

> the impure magnesium powder is melted in an induction/arc furnace and reacted with chlorine gas in a reaction cell to convert any magnesium oxide to the chloride salt.  Hydrochloric acid formed during this chlorination step is sent to scrubbers; the cleaned acid is reused in the beneficiation operations (i.e., for

14

> sulfate removal).  The scrubber underflow, one source of process wastewater, is
> disposed in an on-site impoundment.

(*Id*.)  Likewise, the electrolysis process and the wastewater that is produced as a result were

described as follows:

> After purification, molten magnesium chloride is separated into chlorine gas and
> molten magnesium by applying direct current to the material in electrolytic cells.
> The purified and separated magnesium metal is vacuumed from the surface of the
> electrolytic cell bath; the molten metal is then cast into shapes and alloyed in a
> casting plant.  The chlorine gas is removed, scrubbed, cooled, and reused or sold .
> . . .  The resulting scrubber liquor, which is the second source of process
> wastewater, is also disposed in the on-site impoundment . . . .

(*Id*.)

Additionally, the EPA also reported on the volume and hazard characteristics of the

exempt process wastewaters at the Rowley Facility.  The EPA reported that "[a]pproximately

2,465,000 metric tons of process wastewater reportedly were generated by the Rowley facility in

1988."  (*Id*.)  With regard to the toxicity of the Rowley Facility's process wastewaters, EPA

reported the following:

> Using available data on the composition of magnesium process wastewater, EPA
> evaluated whether the wastewater exhibits any of the four characteristics of
> hazardous waste: corrosivity, reactivity, ignitability, an extraction procedure (EP)
> toxicity.  Based on the available information and professional judgment, the
> Agency does not believe the wastewater is reactive, ignitable, or EP toxic.  In
> fact, all eight inorganic constituents with EP toxicity regulatory levels, with the
> exception of selenium, are present in concentrations that are at least two orders of
> magnitude below the regulatory level, that is, below drinking water standards;
> selenium was not detected in the wastewater.  Some wastewater samples,
> however, exhibit the characteristics of corrosivity.  A pH of approximately 1.2,
> which is below the lower bound corrosivity limit of 2.0, was measured in two out
> of two samples of magnesium process wastewater at the Magcorp facility.  The
> Rowley facility also reports that the wastewater has an average pH of 1.6.

(*Id*.)

In preparing the Report to Congress, the EPA used data it had gathered pursuant to the

1989 National Survey of the Mineral Processing Industry, follow-up investigations, and sampling of individual facilities, including the Rowley Facility.  The EPA stated in its rulemaking record that it was confident that the information it had gathered through the above means was accurate, and that any discrepancies would not have any effect on the EPA's determination.  (*See* USM's Mem. in Supp. S.J. Ex. D.)  The EPA concluded that the magnesium process wastewater at the Rowley Facility did not threaten the environment, was adequately regulated by the Utah Division of Environmental Quality, and therefore did not warrant RCRA Subtitle C regulation.  (*Id.*)

On June 13, 1991, after submitting the Report to Congress and considering public comments, the EPA issued its final regulatory determination which exempted twenty special mineral processing wastes, including  "[p]rocess wastewater from primary magnesium processing by the anhydrous process," from RCRA Subtitle C regulation pursuant to the Bevill Amendment.  56 Fed. Reg. 27300 (June 13, 1991); 40 C.F.R. § 261.4(b)(7)(ii)(O).  The final regulatory determination is consistent with the January 23, 1990, Final Rule and the Report to Congress.

D.     **Interpretation of EPA's Regulation Exempting Primary Magnesium Processing Waste at the Rowley Facility**

Throughout the EPA's Bevill Amendment rulemaking process, from nomination of wastes through promulgation of the final regulation, magnesium was produced at the Rowley Facility by the same process.  Beginning in 1992, after its final regulatory determination regarding the Rowley Facility, the EPA communicated with MagCorp and agencies of the State of Utah regarding the scope of the exemption for "process wastewater from primary magnesium processing by the anhydrous process" through a series of memoranda and letters.

16

Initially, the EPA conducted a RCRA compliance inspection at the Rowley Facility on

March 17, 1992.  The report from the inspection notes that:

> Tripp[5] stated that he believes all wastewaters discharged into the surface
> impoundment are Bevill-exempt.  He stated that the EPA Headquarters sampling
> team had sampled a combined wastewater flow at an inlet to the surface
> impoundment during their 1989 investigation, instead of sampling individual
> waste streams . . . .  The EPA inspector explained that the exempt mineral
> processing wastes were specifically defined in the July 1990 EPA Report to
> Congress, and the definition did not include all wastewaters at the facility.

(United States's Mem. in Supp. S.J. Ex. 26 at 3.)

On August 4, 1992, the EPA sent a letter to the Utah Division of Solid and Hazardous

Waste ("Utah DSHW') to clarify the status of wastes generated at the Rowley Facility which

stated that:

> The only wastes which were considered for the final mineral processing exclusion
> were those that met the "high volume, low hazard" criteria established by EPA.
> Two wastewater streams were identified at MagCorp which satisfied the high
> volume, low hazard criteria: a scrubber underflow from a hydrochloric acid
> purification operation (fume scrubbers), and scrubber liquor from a gas
> purification process (cathode scrubbers).  These are the only two wastewater
> streams at MagCorp which are eligible for the mineral processing waste
> exclusion.

(United States's Mem. in Supp. S.J. Ex. 31 at 2-3.)

On April 21, 1993, MagCorp sent a letter to the Utah DSHW in which MagCorp detailed

its perspective that:

> It has always been Magcorp's position that this exclusion applies to <u>all</u> aqueous
> waste streams directly associated with the purification and electrolysis process at
> its Rowley facility.  These wastewater streams combine in the main wastewater
> ditch and discharge to a pond.  The wastewater stream at the Rowley facility was

---

[5]  Tripp refers to "Tom Tripp," who at the time was MagCorp's "Environmental Manager."

> originally proposed for exclusion on the basis of the combined stream.  It was
> sampled and evaluated by EPA on that basis, proposed for public comment on
> that basis, and finally determined by EPA to be excluded on that basis.

(USM's Resp. to Quest. Posed by Court Ex. D.)

In response to MagCorp's communication of April 21, 1993, the Utah DSHW sought a

clarification from EPA Region VIII regarding the scope of the exemption at the Rowley Facility.

EPA Region VIII in turn sought clarification from EPA Headquarters in a memorandum dated

July 9, 1993, which provides: "We request that your office provide the Region, and thereby the

State of Utah, a determination of the intent of the subject Exemption."  (United States's Mem. in

Supp. S.J. Ex. 27.)

As a result of the request for a determination, EPA Headquarters issued a memorandum

to EPA Region VIII on March 23, 1994, in which the EPA stated:

> In particular, in addition to beneficiation waste streams, EPA intended that only
> two waste streams – scrubber underflow process wastewater and scrubber liquor
> process wastewater – from the Magcorp facility specifically qualify as exempt
> mineral processing wastes.  These waste streams are explicitly identified in the
> 1990 Mineral Processing Wastes Report to Congress.

(USM's Resp. to Quest. Posed by Court Ex. F at 1.)  In addition, the EPA memorandum stated:

> not all of the aqueous wastestreams associated with the purification and
> electrolysis process are exempt . . . .  EPA clearly distinguished between several
> of the Rowley facility's aqueous wastewaters in Chapter 11, pp. 3-4 of the 1990
> RTC (e.g., the second source of special waste – scrubber liquor – is differentiated
> from contact cooling water which is not a special waste).

(*Id*. at 2.)  The EPA then listed certain wastes produced at the Rowley Facility that would not be

uniquely associated with mineral processing and therefore would not be exempt, including:

> washdown water from facility cleaning operations, lab drains, vehicle
> maintenance floor drains, used antifreeze, demineralized water plant discharge,

> surface runoff, cooling tower discharge, ethylene glycol from auto shop and cast
> house, and lubrication oils from compressor blowdown.

(*Id*. at 4.)

On December 10, 1998, EPA Headquarters reaffirmed its earlier interpretation in another

memorandum to EPA Region VIII.  EPA Headquarters reiterated that the non-exempt wastes

produced at the Rowley Facility that had been identified in the March 23, 1994, memorandum

"must be managed in accordance with RCRA subtitle C requirements."  (United States's Mem.

in Supp. S.J. Ex. 29.)

On December 23, 1998, MagCorp sent a letter to the Utah DSHW explaining MagCorp's

position that all "process wastewaters" from mineral processing are exempt "except for those

few wastes that are not uniquely associated with mineral processing.  These non-exempt wastes

would be the Maintenance wastewater, Backwash Demineralization Plant wastewater, and Air

Compressor Building wastewater."  (USM's Resp. to Quest. Posed by Court Ex. I.)

On March 19, 1999, the EPA responded to MagCorp's December 23, 1998, letter by

reiterating the EPA's position that the exemption is limited to the broad, generic language from

the Report to Congress: "scrubber underflow process wastewater and scrubber liquor process

wastewater."  (USM's Resp. to Quest. Posed by Court Ex. J.)

On January 16, 2001, the United States filed its complaint against MagCorp for

violations of RCRA.  The United States asserts that its position has always been that wastewater

from pollution control equipment after the initial scrubbing is not exempt from RCRA Subtitle C

regulation and that the exemption was never meant to apply to wastes from chlorine and

hydrochloric acid manufacturing at the Rowley Facility.  On the other hand, based on the

rulemaking record and the EPA'a prior interpretations of the exemption, USM claims that its

19

predecessors were never made aware of this position until the United States commenced this lawsuit.

      **E.**      **The Instant Motions**

      On June 26, 2006, USM filed its motion for partial summary judgment, asking the Court to dismiss substantially all of the United States claims in the RCRA case because the wastewater discharges that are the subject of those claims are exempt from RCRA regulation as a result of the Bevill Amendment.  It is USM's position that the exemption for the Rowley Facility includes all of the wastewater produced in treating the exhaust gasses from the melt/reaction and electrolytic processes.

      The United States responded by filing its own cross-motion for partial summary judgment asking the Court to agree with its interpretation of RCRA's applicability to certain wastewaters generated at the Rowley Facility.  The United States' position is that after the exhaust gasses from melt/reaction and electrolysis are scrubbed initially by the melt/reaction Ducon scrubber and the electrolytic Ducon scrubber, all further treatment of these gasses ceases to be uniquely associated with primary magnesium processing and the wastewater is not exempt because it is part of separate hydrochloric acid and chlorine production operations.

      After the parties fully briefed their cross-motions for partial summary judgment, the Court heard lengthy oral arguments on December 19, 2006.  At this initial hearing, the Court decided to take the matters under advisement, and also requested that the parties arrange for the Court to visit the Rowley Facility to aid in the decision making process.  After visiting the Rowley Facility on January 4, 2007, the Court requested that the parties file additional briefing in support of their arguments regarding summary judgment.  Upon reviewing the first round of

additional briefing, the Court requested that the parties submit a second round of additional briefing to address even more specific questions from the Court regarding the parties' arguments.

Both USM and the United States agree that there are no disputed facts and that the parties' cross motions for summary judgment present a question of law for the Court based on statutory and regulatory interpretation.


## III. DISCUSSION

### A.    <u>Standard of Review</u>

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *see Anderson v. Libberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  When a court considers cross motions for summary judgment, the court is to "construe all inferences in favor of the party against whom the motion under consideration is made."  *Am. Inv. Fin. v. United States*, 364 F. Supp. 2d 1321, 1323 (D. Utah 2005) (quoting *Pirkheim v. First UNUM Life Inc.*, 229 F.3d 1008, 1010 (10th Cir. 2000)).

### B.    <u>The Parties' Interpretations of the Exemption</u>

In order to decide the instant cross motions for summary judgment, the Court must decide

what constitutes "process wastewater from primary magnesium processing by the anhydrous process," as that phrase in the EPA's final regulatory determination was intended to apply to the Rowley Facility.  Unfortunately, the language of the regulation itself is somewhat ambiguous in that it does not clearly delineate where the line should be drawn between Bevill exempt and non-exempt wastes that are produced at the Rowley Facility.

### 1.    USM's Position

According to USM, exempt magnesium process wastewaters consist of all wastewaters produced as a result of the purification and electrolytic processes, including many of the wastewaters that the United States has identified in its complaint.  These "at issue" wastewaters include those from the chlorine reduction burner and scrubber, the high energy scrubber, and the seal legs associated with the melt/reaction scrubbers, all of which are associated with the melt/reactor.  On the electrolytic side, the "at issue" wastewaters include anode dust wastewater and water wash column wastewater.

It is USM's position that the "at issue" wastewater streams at the Rowley Facility have always been encompassed by the definition of "process wastewater from primary magnesium processing by the anhydrous process."  As long as the Rowley Facility has been in operation, scrubbing the exhaust gasses originating during melt/reaction and electrolysis through a series of scrubbers, and recovery of hydrochloric acid and chlorine, has been an integral part of primary magnesium processing.  Therefore, USM sees this as an action by the United States which seeks to remove a previously established exemption for certain magnesium process wastewaters without ever notifying the Rowley Facility of its position, and without complying with the rulemaking requirements of the Administrative Procedures Act.  5 U.S.C. § 553.

22

### 2.        The United States' Position

The United States' argument depends on a distinction between wastes generated by equipment that is part of magnesium processing, as opposed to equipment that is not part of magnesium processing.  According to the United States, magnesium processing operations are those that separate magnesium from other materials present in Great Salt Lake water to produce a pure magnesium product.  In both the melt/reaction and electrolytic processes, an intermediate to the final magnesium product, or final magnesium product itself, is produced.  At the conclusion of the electrolytic process, no further processing is needed to remove the magnesium from the brine, and thus any further processing of exhaust gasses necessarily yields something other than a magnesium product.

However, the United States acknowledges that the EPA contemplated an exemption for wastewaters from scrubbing exhaust gasses, even though these wastewaters did not technically originate during the actual process of removing magnesium from the Great Salt Lake water.  The United States argues that the exemption only encompasses the wastewater from the melt/reaction Ducon scrubbers and the electrolytic Ducon scrubber (collectively referred to as the "Ducon Scrubbers") because they are the first pollution control devises to clean gasses produced in melt/reaction and electrolysis.  According to the United States, although the Ducon Scrubbers may be one step removed from the mineral processing operations themselves, and although they may actually be processing materials other than magnesium, they operate in a manner that is sufficiently associated with the magnesium processing operations that they are essentially part of the mining operations.  Accordingly, the Ducon Scrubbers are actually part of magnesium processing because they process, or clean, gasses produced in the same operations that produce

23

the final magnesium product.  Therefore, despite the fact that the Ducon Scrubbers do not technically produce magnesium, the United States sees their operation as "uniquely associated" with magnesium processing.

The United States then relies on this concept of uniquely associated wastewaters to distinguish between the wastewaters produced by the Ducon Scrubbers, and the other "at issue" wastewaters which are produced by the chlorine reduction burner and scrubber, packed tower scrubbers, high energy scrubber, associated seal legs, and water wash column (collectively referred to as the "Downstream Scrubbers").  According to the United States, once the Rowley Facility has scrubbed the melt/reaction and electrolysis exhaust gasses with the Ducon Scrubbers, the gasses are transported to the Downstream Scrubbers, which are all part of separate chemical manufacturing processes, and the exemption from RCRA Subtitle C regulation is lost.

In support of its argument, the United States provides evidence that other magnesium producers around the world do not also produce hydrochloric acid and chlorine and that therefore it must not be a necessary part of the magnesium production process.  Additionally, the United States relies on facts and figures showing how much of the hydrochloric acid and chlorine is sold to third parties by USM as opposed to being reused in the process.  The United States also claims that the EPA has always recognized the distinction between wastewaters produced by the Ducon Scrubbers, and wastewaters produced by the Downstream Scrubbers in separate chemical manufacturing operations.  Furthermore, the United States claims that the EPA's interpretation of exempt magnesium processing wastes has been clear to USM and its predecessors at all times relevant to this lawsuit.

C.      **Analysis**

Although USM and the United States agree that the melt/reaction and electrolytic processes are the essence of primary magnesium processing at the Rowley Facility, the parties' arguments diverge when it comes to treating the exhaust gasses produced as a result of those processes.  Based solely on the language of the EPA's final regulatory determination, each of the parties' interpretations of the exemption for primary magnesium processing wastewaters at the Rowley Facility are plausible.  However, a review of the magnesium production process at the Rowley Facility, the EPA's Bevill Amendment rulemaking process, and the EPA's subsequent interpretations of the final regulatory determination, demonstrates that the United States' arguments do not withstand scrutiny given the facts before the Court.

1.      **The United States' Distinction Between the Ducon Scrubbers and the Downstream Scrubbers is Inconsistent with the 1990 Report to Congress and the EPA's Final Regulatory Determination**

The 1990 Report to Congress and the EPA's final regulatory determination do not support the United States' position that the exemption is limited to only the first pollution control units following melt/reaction and electrolysis.  The Report to Congress does not draw a distinction between the process wastewaters from individual pollution control units such as the Ducon Scrubbers, which the EPA now contends are "uniquely associated" with magnesium production, and any of the individual Downstream Scrubbers.  If the United States had intended to make such a distinction, it should have made this clear to Congress and to the Rowley Facility at some point during the rulemaking process.  The EPA simply identified two exempt wastes from primary magnesium processing in the Report to Congress:  (1) wastewater yielded by the scrubbing of exhaust gasses formed during melt/reaction; and (2) wastewater yielded by the

25

scrubbing of exhaust gasses formed during electrolysis.  In its 1990 Report to Congress, the EPA

attached the following diagram to illustrate the process at the Rowley Facility:



It is undisputed that throughout the EPA's rulemaking process, the EPA knew that

MagCorp was treating the exhaust gasses from the melt/reactor and recovering hydrochloric

acid, and that MagCorp was also treating the exhaust gasses from the electrolytic cells and

recovering chlorine.  Nevertheless, the EPA did not draw a distinction among the individual

pollution control units that produce process wastewaters and instead used language and a

diagram that support USM's position that all of the process wastewaters originating from

scrubbing the exhaust gasses are exempt from RCRA Subtitle C regulation pursuant to the Bevill Amendment.  The Ducon Scrubbers begin the process of treating dirty exhaust gasses from the magnesium production process.  The Downstream Scrubbers then continue and complete the treatment of the same exhaust gasses before they are released into the atmosphere.  Thus, the very wastestreams that the United States now seeks to punish the Rowley Facility for excluding from RCRA Subtitle C regulation were in existence, were known to the EPA, and were considered by the EPA as part of its Bevill rulemaking process.

Now, the United States seems to be drawing an arbitrary after-the-fact line between what it deems to be magnesium production on the one hand, and unrelated hydrochloric acid or chlorine production on the other.  However, the United States has been unable to show the Court where it made this distinction clear to the Rowley Facility during the rulemaking process, or at any other time prior to the commencement of this litigation.  If the government had intended to make such a distinction during its rulemaking process, it certainly could have made this more clear to Congress and to the Rowley Facility.

> **2.     The United States' Distinction Between the Ducon Scrubbers and the Downstream Scrubbers is Inconsistent with the EPA's Own Post-Regulation Interpretations of the Exemption**

The United States has not clearly shown the Court where it notified the Rowley Facility of its current position that wastewaters generated by the Downstream Scrubbers are not exempt because they are associated with hydrochloric acid and chlorine production and therefore are not uniquely associated with magnesium production.  Between 1992 and the commencement of this litigation in 2001, the EPA communicated with the Rowley Facility and agencies of the State of Utah regarding the scope of the exemption for "process wastewater from primary magnesium

27

processing by the anhydrous process" through a series of memoranda and letters.  *Supra* Section
II.D.  The Court is unable to find where the EPA communicated to the Rowley Facility that the
wastewaters produced by the Ducon Scrubbers were exempt while the wastewaters produced by
the Downstream Scrubbers was not.  Instead, the language the United States relies on in support
of its interpretation instructs the Rowley Facility to look to the definition of the exemption in the
Report to Congress.  And, as discussed above, the 1990 Report to Congress and its diagram tend
strongly to support the position now taken by USM.

The only mention of the "hydrochloric acid purification operation" and the "chlorine gas
purification operation" indicated that the scrubber underflow/liquor from these operations was
exempt.  Additionally, the EPA actually identified certain wastes it claims were not uniquely
associated with magnesium processing.  Absent from this list were any of the wastewaters
produced by any of the Downstream Scrubbers that the United States now claims are not
uniquely associated.  Indeed, the EPA told the company that "washdown water from facility
cleaning operations, lab drains, vehicle maintenance floor drains, used antifreeze, demineralized
water plant discharge, surface runoff, cooling tower discharge, ethylene glycol from auto shop
and cast house, and lubrication oils from compressor blowdown" were not exempt.  (USM's
Resp. to Quest. Posed by Court Ex. F at 4.)  In contrast, the EPA did not ever clearly notify the
Rowley Facility of its current position that the wastewaters produced by any of the individual
Downstream Scrubbers is not uniquely associated with magnesium production and therefore not
exempt.

> 3.     **The Wasteswaters Produced by the Ducon Scrubbers is Virtually the
>        Same as the Wastewaters Produced by the Downstream Scrubbers**

Both parties agree that the wastewaters produced by the Ducon Scrubbers have higher

28

concentrations of particulate matter than do the wastewasters produced by the Downstream

Scrubbers.  In fact, the Ducon Scrubbers remove approximately 95% of the particulate matter

from the exhaust gasses, while the Downstream Scrubbers remove only small amounts of

particulate matter.  The wastewaters produced by Downstream Scrubbers are also less acidic.

The reason is that the Downstream Scrubbers are treating exhaust gasses that have already been

partially treated by the Ducon Scrubbers.  The wastewaters from the Downstream Scrubbers

contain basically the same types of wastes as the wastewaters the government claims are exempt,

only the concentrations are less.

### 4. Magnesium Has Always Been Produced at the Rowley Facility Using the Same Process

Magnesium processing at the Rowley Facility has remained essentially the same since

1972.  After MagCorp nominated wastewaters generated in primary magnesium processing at the

Rowley Facility, the EPA studied that particular facility and issued a regulation that applies only

to that facility, the only producer of magnesium by the anhydrous method in the United States.

Notwithstanding the one-facility nature of the exemption, the United States argues that

USM is now choosing to utilize the manufacturing and pollution control processes that yield

hydrochloric acid and chlorine at the Rowley Facility.  However, the design choices regarding

magnesium processing at the Rowley Facility were made by USM's predecessors approximately

twenty years before the EPA's final regulatory determination in 1991, and the EPA was well

aware of this during the Bevill rulemaking process.  All of the processes for treating the dirty

exhaust gasses from melt/reaction and electrolysis which result in the recovery of hydrochloric

acid and chlorine were in operation at the Rowley Facility, and were known to the EPA,

throughout the Bevill rulemaking process.

29

In support of its argument, the United States relies on the fact that other magnesium plants throughout the world are able to produce magnesium without also producing hydrochloric acid or chlorine.  References to these other magnesium and metal producers are used to provide examples of how the United States believes primary magnesium processing at the Rowley Facility could or should be different, and why processes used at the Rowley Facility are not actually necessary to producing magnesium.  In other words, other facilities' ability to make magnesium without the aid of the same Downstream Scrubbers in use at the Rowley Facility somehow shows that these pieces of equipment are not part of magnesium processing, but are part of a separate, non-exempt chemical processing operation.

The problem with these arguments is that they ignore the fact that the exemption for wastewaters at the Rowley Facility was based exclusively on the wastewaters generated by the processes and technology actually used at the Rowley Facility.  The EPA only evaluated and exempted primary magnesium processing at the Rowley Facility and therefore it was magnesium processing specific to the Rowley Facility that received the exemption from RCRA Subtitle C hazardous waste regulation.

As with its reference to practices at other magnesium plants, the United States' arguments regarding the current economics of byproduct operations has no bearing on a reading of the regulation that was specifically tailored to the Rowley Facility in 1991.  Furthermore, USM does not claim that the Bevill exemption for magnesium process wastewaters extends to all wastes created in these byproduct operations.  USM and its predecessors have been treating the exhaust gasses from melt/reaction through a series of devices and as a result it recovers hydrochloric acid.  The hydrochloric acid then goes through processes in which it is converted to

calcium chloride and iron chloride.  However, USM does not claim that wastes generated during this further processing is exempt.  Likewise, after the cleaned chlorine gasses leave the water wash column, USM cools and compresses the gas, converting it into liquid form.  However, USM does not claim that the wastes generated during the conversion process are exempt.

The United States further argues that magnesium processing at the Rowley Facility is not the same as it was when its was granted its Bevill exemption.  Specifically, the waste generated by the chlorine reduction burner & scrubber should not be exempt because each piece of equipment must have been on-line as of September 1, 1989.  However, the chlorine reduction burner & scrubber was not installed or operational until at least June of 1990.

With respect to the United States' arguments regarding the chlorine reduction burner & scrubber, by adopting the United States' argument, USM would be penalized for upgrading its pollution control equipment during the Bevill rulemaking process when it is undisputed that the wastewater generated by this piece of equipment is no different in kind than that produced by the melt/reactor Ducon scrubbers, only it produces much less waste.

By recognizing that magnesium production is the same process as it has always been at the Rowley Facility, the Court can envision that all of the wastes produced by the Downstream Scrubbers, in addition to the Ducon Scrubbers, must have been intended to be exempted by the EPA.

     **5.**     **If the United States' Interpretation Were Correct, the Rowley Plant Would Have Never Qualified For the Exemption**

It is important to remember that the United States is not asserting claims against USM for misrepresenting important information to the EPA during the Bevill rulemaking process, nor does the United States seek to revoke the exemption even though it now appears that USM may

31

not meet the high volume and low toxicity requirements.  The United States merely seeks to regulate certain wastewaters produced at the Rowley Facility that it believes should not be exempted from RCRA Subtitle C regulation.

If the United States were to prevail in its interpretation of exempt versus non-exempt wastewaters, then each pollution control device would need to independently satisfy the high volume and low toxicity requirements.  If this were the case, then neither the wastewater stream from the melt/reactor Ducon scrubber, nor the wastewater stream from the electrolytic Ducon scrubber – wastewaters that are supposedly exempt according to the EPA – would have met the high volume criterion for the exemption.  Only by viewing "primary magnesium processing by the anhydrous process" in the same manner that the EPA and USM viewed it during the Bevill rulemaking process – as an entire process – can one find any process wastewaters from primary magnesium processing that meet all of the qualifications of the regulation.  In promulgating the exemption for the Rowley Facility, it is unlikely that the EPA intended that the exemption cease after the first scrubber units because without the later units, it appears that none of the wastewaters from the Rowley Facility would have met the high volume requirement fixed by Congress in the Bevill Amendment.  This would lead to a result wherein a regulation drafted specifically to exempt magnesium processing wastewaters at the Rowley Facility would not have ever applied to the Rowley Facility at all.

When the EPA sampled and analyzed USM's primary magnesium processing wastewaters to determine whether they qualified for a Bevill exemption, the EPA sampled the wastewaters at the Rowley Facility in the aggregate, rather than separating out and sampling individual waste streams from individual pieces of equipment.  Based on the EPA's own

32

sampling, the EPA concluded that the combined wastewater streams satisfied the high volume and low toxicity requirements.  Furthermore, the EPA relied on aggregated data as reported by Amax to support its conclusion that the wastewater from primary magnesium processing at the Rowley Facility was high volume.  The United States has been unable to explain how the EPA's decision to sample the wastewater where it did squares with its position today that each pollution control device must independently yield a high volume, low toxicity waste.

## IV.  CONCLUSION

From 1989 through 1991, the EPA engaged in an extensive rulemaking process and determined that "process wastewater from primary magnesium processing by the anhydrous process" was exempt from RCRA Subtitle C regulation pursuant to the Bevill Amendment. Upon reviewing the regulation, the Bevill rulemaking record, and the arguments of the parties, the Court finds that the EPA's final regulatory determination exempting magnesium processing wastewaters at the Rowley Facility applied to each of the disputed wastewaters that are being challenged by the United States as non-exempt RCRA wastes.  In fact, that all of these mineral processing wastes are exempt is the only reasonable reading of the regulation given the fact that: (1) the Rowley Facility has been using essentially the same process to produce magnesium throughout its existence; (2) the Ducon Scrubbers and the Downstream Scrubbers produce a very similar waste; (3) if the United States' interpretation were correct, it does not appear that the Rowley Facility would ever have qualified for the exemption at all; (4) the United States' current interpretation of the regulation contradicts what the EPA did during its Bevill rulemaking process, as described in the EPA's Report to Congress; and (5) the United States' current interpretation is inconsistent with the EPA's post-regulation interpretations of the exemption for

33

the Rowley Facility.

Accordingly, Defendant USM's motion for partial summary judgment is GRANTED and

Plaintiff United States' cross motion for summary judgment is DENIED.

IT IS SO ORDERED.

DATED this 15th day of October, 2007.


BY THE COURT:

_____
DEE BENSON
United States District Judge

34